UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/11/2018

RAMONA J. ROSARIO, as administrator of the
estate of Haniel Reyes-Rosario, AND RAMONA J.
ROSARIO, individually,

                            Plaintiff,

        -against-

TOWN OF MOUNT KISCO, VILLAGE OF
MOUNT KISCO, FRANCESCA LUPPINO,
FRANCESCA LUPPINO 2013 REVOCABLE
LIVING TRUST, ANTONIO LUPPINO, AND
SHARON DASILVA,

                            Defendants.

OPINION AND ORDER

16-CV-8766 (NSR)

NELSON S. ROMÁN, United States District Judge:

        Plaintiff Ramona J. Rosario ("Plaintiff") commenced this action individually and as

administrator of the estate of Haniel Reyes-Rosario against the Town and Village of Mount Kisco,

Francesca Luppino, Francesca Luppino 2013 Revocable Living Trust, Antonio Luppino, and

Sharon Dasilva (collectively "Defendants"), asserting federal claims under the Fourteenth

Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1983 along with several

state law claims. (First Amended Complaint ("AC"), ECF No. 42.) Before this Court is Defendants

Town and Village of Mount Kisco and Antonio Luppino's Motion to Dismiss the Amended

Complaint. For the following reasons, Defendants' respective motions are GRANTED, with leave

to amend the pleadings.

## Background[1]

This case arises from an incident concerning a Hispanic[2] immigrant, Haniel Reyes-Rosario ("Haniel"), who, as a resident of Mount Kisco, passed away during a fire in his basement apartment. In order to understand Haniel's death, Plaintiff posits that it is necessary to understand the history of the municipality in which he perished.

The Town and Village of Mount Kisco (collectively, "Mount Kisco") is home to a substantial Hispanic immigrant population. (*See* AC ¶¶ 39–41.) Mount Kisco began experiencing an influx of Hispanic immigrants during the 1980s and 1990s resulting in tension between the immigrant and non-immigrant communities. (*Id.* ¶¶ 40–41, 44, 86.) The influx of Hispanic immigrants, coupled with a housing shortage in Mount Kisco, created the perfect conditions for landlords to demand high rents for rented basements, attics, and other rooms. These dwellings often violated multiple housing regulations. (*Id.* at ¶ 44.) As tensions between the immigrant and non-immigrant population continued growing, Mount Kisco increased its enforcement of various housing regulations, and particularly regulations that "prohibited large groups of unrelated people from living together in dwellings." (*Id.* ¶¶ 48, 58.) The enforcement of these regulations was aimed at targeting dwellings with Hispanic immigrants in an effort to drive that community out of Mount Kisco. (*Id.* ¶¶ 58, 60, 63.) Mount Kisco continued its alleged attempt to drive out Hispanic immigrants by passing ordinances restricting Hispanic immigrants from soliciting work and subjecting Hispanic immigrants to police harassment (*Id.* ¶¶ 65, 67.) The allegedly racially motivated attempt to expel Hispanic immigrants from Mount

---

[1] The following facts are derived from the Complaint, and are assumed as true for the purposes of Defendants' motion to dismiss. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint").

[2] The Court adopts the Complaint's nomenclature which refers to Plaintiff and people of Latin American ancestry as "Hispanic."

Kisco came to a halt when, in the 1990s, several law suits against the Town/Village resulted in a Consent Decree by which Mount Kisco agreed to reform "its policy of discriminating against the Hispanic immigrant population." (*See id.* ¶¶ 76–77.) Since entering into the Consent Decree, the Hispanic population in Mount Kisco grew from a mere 5% in 1980, to an estimated 44.9% in 2015. (*Id.* ¶¶ 41, 78, 81.)

In the aftermath of the Consent Decree, Landlords still "illegally rent basements, attics and rooms to Hispanic immigrants." (*Id.* ¶ 82.) The continued housing shortage in Mount Kisco, along with the demand for housing by Hispanic immigrants, allowed landlords to continue charging high rents for those living spaces. (*Id.* ¶ 83.) As a result, there continues "to be an abundance of immigrants living in unhealthy and unsafe conditions in Mount Kisco." (*Id.* ¶ 84.)

Following the Consent Decree, Plaintiffs allege that Mount Kisco developed a new policy targeting Hispanic immigrants. (*See id.* ¶¶ 86, 88.) In this new iteration, Mount Kisco developed a policy of simply ignoring the "deplorable" and "unsafe" housing conditions of Hispanic immigrants. (*Id.* ¶ 89.) Plaintiff alleges that Mount Kisco carries out this policy by taking no steps to increase affordable housing, taking no steps to regulate landlords in Mount Kisco, taking no steps to regulate rentals in Mount Kisco, and by taking no steps to effectively prosecute landlords who charge unreasonable amounts of rents for unhealthy, unsafe and illegal basements, attics and rooms. (*Id.* ¶¶ 90–94.)

Haniel and his mother, Plaintiff Ramona Rosario (collectively, "Plaintiff"), both Hispanic immigrants, were residents of Mount Kisco. (*See id*. ¶¶ 32–33, 207) Haniel eventually moved into a basement apartment located at 121 St. Marks Place, Mount Kisco, New York. (*Id.* ¶ 17.) Defendant Francesca Luppino (Mrs. Luppino) and her husband Rocco Luppino purchased the property in

which the apartment was located on March 16, 1979. (*Id.* ¶ 18.)[3] The house containing the apartment was originally erected in or about 1927 as a single-family home with an unfinished basement (*Id.* ¶ 36). The house was converted into a three-apartment dwelling at some point after the initial construction, allegedly without receiving a building permit or certificate of occupancy as required by the relevant housing regulations. (*Id.* ¶ 37.)

Haniel and Defendant Sharon Dasilva were renting the basement apartment on the property when on the morning of January 20, 2016, a fire started in the basement apartment. The basement apartment was allegedly devoid of any smoke detectors, a fire suppression and extinguishing system, or adequate emergency escapes and/or rescue openings. (*Id.* ¶ 136.) Haniel Reyes-Rosario was trapped in the basement apartment, succumbed to his injuries and perished in the fire. (*Id.* ¶¶ 20–22.)[4]

Plaintiff alleges that Haniel's death was caused, in part, by Mount Kisco's policy of not enforcing the relevant housing regulations which are "carried out pursuant to the policies and customs of the Village/Town as well as their agents and employees and their various departments including, but not limited to, the Building Department." (*Id.* ¶¶ 122, 135.)[5]  Specifically, Plaintiff alleges that Mount Kisco was aware that the Property consisted of three separate dwellings and that their awareness should have prompted the enforcement of the housing regulations. Plaintiff alleges that Mount Kisco received complaints that the basement and attic of the property were being used

---

[3] On December 10, 2013, Francesca Luppino conveyed the Property to Defendant Francesca Luppino 2013 Revocable Living Trust. (AC ¶ 19.)

[4] Ramona Rosario was appointed as the Administrator for the estate of Haniel Reyes-Rosario on July 5, 2016. (*Id.* ¶ 23.)

[5] Plaintiff alleges that Mount Kisco is responsible for the administration and enforcement of the New York State Uniform Fire Prevention and Building Code ("Uniform Code"), the State Energy Conservation Construction Code ("Energy Code"), its own Code ("Village Code") as well as any federal, state and local laws, ordinances and regulations governing housing standards within the Village/Town (collectively the "Housing Regulations"). (*Id.* ¶ 29.)

as independent dwelling units, yet none of these complaints resulted in any action by Mount Kisco. (*Id.* ¶¶ 95–97.)

Plaintiff does note, however, that Mount Kisco conducted inspections of the property on an annual basis from 2005 to 2010. (*Id.* ¶ 102.) Plaintiff further alleges that during these inspections it was "obvious and apparent that the basement and, at times, the attic were being used as independent rental dwellings" because there were three electric meters on the exterior of the house suggesting that there were at least three separate rental units. (*Id.* ¶¶ 104–05.) Defendant Mrs. Luppino also paved a portion of the property to make way for an additional parking spot. (*See id.* ¶ 106.) Despite these signs, Mount Kisco did not conduct any inspections, issue violations, or take any affirmative steps in between January 26, 2010 and January 20, 2016. (*Id.* ¶¶ 113–15.) On one occasion, Mount Kisco allegedly advised Mrs. Luppino and her husband that "they could use the basement space for habitation as long as the basement apartment was in an unseparated relationship with the first floor dwelling as one single dwelling unit." (*Id.* ¶ 98.)

Plaintiff also alleges that Haniel's death was caused, in part, by the negligence and nonfeasance of Defendant Antonio Luppino ("Mr. Luppino"). Plaintiff alleges that at all relevant times either Defendant Mr. Luppino or Defendant Mrs. Luppino were responsible for managing the property and were responsible for maintenance issues, regulatory compliance, rental collection, overseeing the day-to-day operations of the Property, and were agents for, and represented, the property owner during one or more inspections conducted at the Property. (*Id.* ¶¶ 160–62, 164–66.) Mr. Luppino's failure to adhere to the housing regulations while performing his duties, allegedly, contributed to Haniel's death.

## Standard on a Motion to Dismiss

The relevant inquiry under Rule 12(b)(6) is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

5

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## Discussion

Defendants Mount Kisco and Antonio Luppino move to dismiss the claims against them. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Therefore, the Court begins its analysis with Plaintiff's federal claims against Defendant Mount Kisco arising under 42 U.S.C. § 1983.

Plaintiff brings two causes of action under §1983 sounding in: (1) selective enforcement of the housing regulations; and (2) "disparate impact." These claims stem from an alleged widespread policy and practice of discriminating against the Hispanic immigrant community.

## I.     Standing

Defendant Mount Kisco challenges Plaintiff's Article III standing to bring this suit against the municipality and argues that Plaintiff lacks standing to challenge Mount Kisco's enforcement

policies of the housing regulations. (Mem. of Law in Supp. of the Town/Village of Mount Kisco's Mot. to Dism. ("Def. Mot.") 8, ECF No. 57.)

While it is true, as Defendants note, that, at least in the context of a criminal prosecution, a "citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), the appropriate standard for standing remains the three-part test originally articulated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). *See Ostrowski v. Mehltretter*, 20 F. App'x 87, 91 (2d Cir. 2001) (summ. order); *see also Walzer v. Town of Orangetown*, No. 13–CV–7971 (CS), 2015 WL 1539956, at *6 (S.D.N.Y. Apr. 7, 2015) (noting that in the criminal context, a "Plaintiff does not have a constitutionally protected right to a government investigation of alleged wrongdoing."). "'Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

By relying on *Linda R.S.* and its progeny, Defendant Mount Kisco ostensibly challenges the "traceability" of the constitutional injury to the challenged action. *See Linda R.S.*, 410 U.S. at 617–18 ("we hold that, in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks to justify judicial intervention"); *Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) ("As in *Linda R.S.*, there is a questionable nexus between respondents' injury-the alleged beatings-and the actions of the state officials . . ."). Therefore, this court must decide whether there is a causal nexus between the alleged injury and the Defendants' conduct. *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury") (quotations and citation omitted).

The traceability requirement "is not equivalent to a requirement of tort causation" and "for purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause." *Rothstein*, 708 F.3d at 92 (quotations and citations omitted). Indeed, Plaintiff's burden to plead the traceability requirement is "relatively modest" at this stage. *Bennett v. Spear*, 520 U.S. 154, 171 (1997). Typically, the nexus "is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue." *Rothstein*, 708 F.3d at 91. A Plaintiff, however, "does not lack standing merely because her injury is an indirect product of the defendant's conduct." *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993); *Rothstein*, 708 F.3d at 91.

The Complaint offers sufficient factual allegations to support a finding of a causal nexus between the injury (Haniel's death) and the corresponding state action (non-enforcement of the housing regulations). Here, Plaintiff alleges that given the growing anti-Hispanic atmosphere, Mount Kisco implemented an official policy of non-enforcement of the housing regulations. Mount Kisco implemented this policy and failed to inspect the subject property from 2010 to 2016 despite various complaints and prior routine inspections indicating that the basement and attic were being used as independent dwellings. Mount Kisco's supposed policy facilitated the conditions resulting in Haniel's death. An inspection of the premises would have, plausibly, uncovered the conditions that trapped Haniel in the basement apartment during the fire. Accordingly, the Complaint's factual allegations, and any reasonable inferences therefrom, are sufficient to allege the relatively modest traceability requirement. *See Rothstein*, 708 F.3d at 92–93 (finding that "plaintiffs' injuries in bombings and rocket attacks conducted by Hizbollah and Hamas were fairly traceable to UBS's provision of U.S. currency to Iran" when Iran's ability to amass U.S. currency to fund such attacks was increased by UBS's transfers).

# I.      Municipal Liability

Plaintiff brings two federal claims against Mount Kisco under the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.  Defendant asserts that the claims against the municipality should be dismissed because Plaintiff did not properly plead the municipal policy or custom and causation requirements necessary to bring a § 1983 claim against a municipality.

Local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by [that body's officers]." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). As the Second Circuit articulated: "[i]n order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  Most relevant to this case are the third and fifth elements—causation and the existence of an official municipal policy.

An "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S at 61. A policy or custom may be established under the following theories:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

This element "reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor'" *Lowery v. Westchester County Department of Correction*, No. 15-CV-4577 (KMK), 2017 WL 564674, at *5 (S.D.N.Y. Feb. 10, 2017) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)). Following the establishment of a municipal policy or custom, Plaintiff must show a "direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404; *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018).

Plaintiff alleges sufficient facts to support the plausibility of an existing policy or custom. It is true, as Defendants note, that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012). Here, however, Plaintiff offers allegations allowing the Court to infer what city policies, practices or customs contributed to, or caused, the alleged constitutional violation. Plaintiff first states that Defendant Mount Kisco has a policy of discriminating against Hispanic immigrants. Plaintiff then alleges that Defendants implement the alleged policy by not enforcing the housing regulations, not taking steps to increase affordable housing, and by not taking steps to regulate landlords. These allegations provide the necessary description to allege a policy or custom adopted by Defendants. *See Isaac v. City of New York*, 17 Civ. 1021 (PGG), 2018 WL 1322196, *6 (S.D.N.Y. March 13,

2018) ("[A] plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists") (quotations and citations omitted); *Torres v. Aramark Food*, No. 14-CV-7498 (KMK), 2015 WL 9077472, at *11 (S.D.N.Y. Dec. 16, 2015) (holding that Defendant's alleged practice of providing "inadequate nutrition" which then forced Muslim inmates, who were exercising their religious beliefs, to be taken off the kosher diet was sufficient to allege, at least circumstantially, the inference that a policy or custom existed); *Ceparano v. Suffolk Cnty. Dep't of Health*, 485 F. App'x. 505, 508–09 (2d Cir. 2012) (holding that Plaintiff's allegation that "the [Suffolk County Department of Health] has adopted a custom of denying adequate medical care to inmates for the purpose of saving money" was sufficient to plead a policy or custom).

The Court must next determined whether Plaintiff has sufficiently plead that Defendant's policy was plausibly the direct causal link of Plaintiff's injury. Defendant argues that Mount Kisco cannot be held liable for its purported failure to regulate private citizens resulting in harm to other individuals. (Def. Mot. 7.) In other words, because the owner or managing agent of the subject property created the purportedly dangerous conditions at issue, Mount Kisco did not partake in "state action" for purposes of § 1983, and that if it did, any action was too attenuated for purposes of liability. (*Id.*)

The Complaint contains insufficient factual allegations to support a direct causal link between the alleged municipal policy and the constitutional violation. *See Brown*, 520 U.S. at 404. Taking Plaintiff's factual allegations as true, Defendant Mount Kisco plausibly knew that the Property's basement was inhabited and further advised the property owner that such a living arrangement was permissible so long as the basement apartment was in an unseparated relationship with the first floor dwelling unit.  During this time, Mount Kisco allegedly failed to conduct any inspections on the property. Although Defendant Mount Kisco was certainly responsible for enforcing the appropriate housing regulations, the causal link is too tenuous to fulfill the causation

element needed for municipal liability. Specifically, the Complaint does not provide sufficient factual allegations supporting the plausibility that Mount Kisco's supposed non-enforcement of the housing regulations was the direct causal link of Plaintiff's constitutional injury. *See Pluma v. City of New York*, No. 13 Civ.2017(LAP), 2015 WL 1623828, at *10 (S.D.N.Y. March 31, 2015) (holding that the causal connection between a policy of trapping demonstrators in a manner that involves the use of excessive force and he constitutional injury was too tenuous when "[n]othing in the Complaint suggests that Plaintiff was trapped or held by the police in a confined area"); *Roe*, 542 F.3d at 37 ("Therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury") (quotations and citation omitted); *Vasconcelloes v. City of New York*, 12 Civ. 8445(CM)(HBP), 2016 WL 403474, at *2 (S.D.N.Y. Jan. 28, 2016) ("the causal link must be strong; that is, the policy must be the moving force behind a constitutional violation") (quotations and citation omitted). These factual allegations, without more, cannot establish the "strong" causal link needed between the alleged constitutional violations that resulted from the deplorable living conditions and Mount Kisco's policy of non-enforcement of housing regulations. *See Melvin v. County of Westchester*, Case No. 14-CV-2995 (KMK), 2016 WL 1254394, *13 (S.D.N.Y. March 29, 2016) (holding that the Complaint did not demonstrate a direct causal connection between the constitutional deprivation suffered by Decedent and the purported policy of understaffing).

Nevertheless, the Court grants Plaintiff leave to replead this claim and to provide, in good faith, factual allegations supporting the causation element of the municipal liability claim.

### a. Selective Enforcement of Housing Regulations

To properly plead a selective enforcement claim in violation of the Equal Protection Clause of the Fourteenth Amendment, Plaintiff must proffer sufficient factual allegations supporting "(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such

selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017) (summ. order) (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004)). Generally, a Plaintiff "must satisfy both elements to establish a claim of selective enforcement." *LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999).

The first prong of the selective enforcement analysis consists of two requirements. First, Plaintiff must identify a similarly situated comparator and, second, Plaintiff must show that compared with others similarly situated, Plaintiff was treated differently. *See Tower Properties LLC v. Village of Highland Falls*, No. 14 Civ. 4502 (NSR), 2017 WL 519267, at *4 (S.D.N.Y. Feb. 7, 2017). Courts in the Second Circuit are split over the proper test for determining whether a comparator is similarly situated in the selective enforcement context. *See Missere v. Gross*, 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011). Nevertheless, Plaintiff must still "plead sufficient facts from which a reasonable person could infer that Plaintiff and the [comparator] were similarly situated." *Lederman v. Benepe*, No. 12 Civ. 6028(PGG), 2014 WL 1318356, at *13 (S.D.N.Y March 28, 2014.).

Defendant argues that this claim should be dismissed because Plaintiff failed to identify similarly situated comparators who were treated differently. (Mount Kisco Mot. 5.) Plaintiff notes that the Complaint does identify a similarly situated group of individuals, namely "residents living in Mount Kisco." (Pl. Mem. of Points and Auth. in Opp. to Def. Mot. to Dism. ("Pl. Opp.") 10, ECF No. 60.)

Plaintiff's allegations are insufficient to state a claim upon which relief can be granted. Although Plaintiff need not proffer evidence of a similarly situated comparator at this stage, the Court must still determine, based on the factual allegations in the Complaint, if it is plausible that a

jury could determine that the comparators are similarly situated and that they were treated differently. *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 434 (S.D.N.Y. 2013); *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 604 (S.D.N.Y. 2010) (noting that a selective enforcement claim requires "more than a bare allegation that other [comparators] were treated differently"). Here, the gravamen of Plaintiff's allegations concerning a similarly situated comparator is that "[a]s a matter of policy and practice, the Village/Town did not and does not act similarly toward buildings occupied by non-immigrant tenants, residents and/or occupants." (AC ¶ 127.) Plaintiff's generalized description of potential comparators as other "non-immigrant tenants" of Mount Kisco is insufficiently detailed for this Court to determine if a jury could plausibly decide that the unidentified comparators are similarly situated to Haniel. The complaint is devoid, for example, of any details concerning how the purported comparator is similar or in a similar situation to that of Haniel. Accordingly, Plaintiff fails to state a claim upon which relief can be granted. *Vaher*, 916 F. Supp. 2d at 434; *see Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 572–73 (S.D.N.Y. 2012) (dismissing a selective enforcement claim because Plaintiff's allegations did not offer details regarding other similarly situated individuals). In any event, Plaintiff is likewise granted leave to replead the selective enforcement claim.

### b. Disparate Impact

Defendant next moves to dismiss Plaintiff's purported "disparate impact" claim. In the Opposition, Plaintiff noted that the Complaint included a "disparate impact" claim brought under the Equal Protection Clause of the Fourteenth Amendment. (Pl. Opp. 11.) It is unclear from both the Complaint and the Opposition what type of claim Plaintiff truly intends to bring. The Court gleans at least two: (1) Plaintiff intends to bring a conventional "disparate impact" claim; or (2) Plaintiff intends to bring an intentional discrimination claim and intends to use the alleged disparate impact to show discriminatory intent.

Given that the Equal Protection Clause "prohibits only intentional discrimination" and "does not have a disparate-impact component," this Court construes such a contention as a claim of intentional discrimination. *See Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (Ginsburg, J., dissenting) (citing *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012) ("[E]qual protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy").[6]

A Plaintiff may plead intentional discrimination that violates the Equal Protection clause in several ways: "[a] plaintiff could: (1) 'point to a law or policy that expressly classifies persons on [an improper basis];' (2) 'identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner;' or, (3) 'allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.'" *Dava v. City of New York,* 1:15-cv-08575 (ALC), 2016 WL 4532203, at *7 (S.D.N.Y. Aug. 29, 2016) (quoting *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000)). In this case, Plaintiff appears to proceed under the second theory—that the facially neutral housing regulations are applied in an intentionally discriminatory manner.

In order to plead intentional discrimination under the second theory, Plaintiff need not allege that "the challenged action rested solely on racially discriminatory purposes, or even that a discriminatory purpose was the dominant or primary one. Rather, plaintiffs must prove that a discriminatory purpose has been a motivating factor in the challenged action. That is, plaintiffs must

---

[6] Insofar as Plaintiff brings a disparate impact claim under the Equal Protection Clause of the Fourteenth Amendment, that claim is dismissed. *Wynn v. New York City Housing Authority*, No. 14–cv–2818 (SAS), 2015 WL 4578684, at *6 (S.D.N.Y. July 29, 2015) ("[D]isparate impact theories are not cognizable under either Section 1981 or the Equal Protection Clause of the Fourteenth Amendment").

show that those who carried out the challenged action selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 571 (S.D.N.Y. 2013) (citations and quotations omitted).

The Equal Protection Clause of the Fourteenth Amendment "has long been interpreted to extend to governmental action that has a disparate impact on a minority group only when that action was undertaken with discriminatory intent." *Brown*, 221 F.3d at 338 (citing *Washington*, 426 U.S. at 239–41). Most relevant here, "a neutral law does not violate the Equal Protection Clause solely because it results in a racially disproportionate impact; instead the disproportionate impact must be traced to a purpose to discriminate on the basis of race." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 260 (1979). "Although [d]isproportionate impact is not irrelevant, to violate the Fourteenth Amendment the disproportionate impact must be traced to a purpose to discriminate on the basis of race." *Hayden v. Paterson*, 594 F.3d 150, 162–63 (2d Cir. 2010) (quotations and citations omitted). Allegations of disparate impact can be used to infer discriminatory intent. Statistical evidence of disparate impact, for example, may establish a *prima facie* case of discriminatory intent when "the statistics [] not only [are] statistically significant in the mathematical sense, but they [are] also [] of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015). After providing relevant statistics, Plaintiff must then allege sufficient facts that trace the alleged disparate impact to a purpose to discriminate on the basis of race. *See Hayden*, 594 F.3d at 164.

Defendant Mount Kisco argues that Plaintiff's claim should be dismissed because the Complaint does not contain specific factual allegations supporting the proposition that a facially neutral municipal policy had a disparate impact on a protected class of individuals. (Reply Mem. of

16

Law in Supp. of Town/Village of Mt. Kisco's Mot. to Dism. ("Def. Reply") 3–4, ECF No. 62.)
Further, Defendant argues that Plaintiff has not alleged facts supporting the plausibility of Mount
Kisco's discriminatory intent. (*Id.*) Plaintiff, in turn, points to multiple allegations in the Complaint
where she notes that Hispanic immigrants overwhelmingly occupy buildings which violate the
relevant housing regulations, and that Defendant Mount Kisco does not enforce the housing
regulations in those situations, thus depriving the Hispanic immigrant population of the minimum
living conditions provided for under the housing regulations. (Pl. Opp. 11–12.)

Defendant's motion to dismiss this claim is granted. Plaintiff does not provide factual
allegations supporting the plausibility of discriminatory intent or disparate impact. The Complaint
alleges that Defendant Mount Kisco applied a facially race-neutral law in an intentionally
discriminatory manner, that the overwhelming majority of people in Mount Kisco who live in
illegal basements, attics, and rooms are Hispanic immigrants, (AC ¶ 118.), and that Defendant
Mount Kisco's failure to enforce the housing regulations with respect to Hispanic immigrants has
the effect of depriving the Hispanic immigrant population of dwellings in conformity with the
housing regulations. (AC ¶¶ 118–19.) Plaintiff further alleges that the housing regulations are not
enforced when a Hispanic immigrant occupies a dwelling. These claims, without more, are not
factual allegations.  It is Plaintiff's responsibility to "specifically allege the events claimed to
constitute intentional discrimination as well as circumstances giving rise to a plausible inference of
racially discriminatory intent." *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)
(quotations and citations omitted). The allegations provided here are not factual, but rather,
conclusory and "naked assertions" that do not provide facts upon which a court could find a
violation of the Equal Protection Clause. *See id.*

There certainly could be a situation where factual allegations of disparate impact on the
Hispanic immigrant population, coupled with Plaintiff's further factual allegations of racial animus,

could plausibly establish discriminatory intent. *See Bloomingburg Jewish Educ. Center v. Village of Bloomingburg, N.Y.*, 111 F. Supp. 3d 459, 486 (S.D.N.Y. 2015) ("Discriminatory intent may be evidenced by such factors as disproportionate impact, the historical background of the challenged decision, antecedent events, departures from normal procedures, and contemporary statements by decisionmakers."). Without any factual allegations, however, the Complaint fails to plausibly allege discriminatory intent or disparate impact. Plaintiff is likewise granted leave to replead this claim.

## II.     **State Claims against Mount Kisco**

Defendant Mount Kisco next moves to dismiss Plaintiff's state law claims because the Town/Village is immune from suit for claims relating to its failure to enforce building or safety codes. The Court agrees.

Under New York Law, a municipality can partake in discretionary and ministerial actions. "Government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general." *McLean v. City of New York*, 12 N.Y.3d 194, 203 (2009); *Metz v. State of New York*, 20 N.Y.3d 175,180 (2012) (noting that in "'the absence of some special relationship creating a duty to exercise care for the benefit of particular individuals, liability may not be imposed on a municipality for failure to enforce a statute or regulation'") (citing *O'Connor v. City of New York*, 58 N.Y.2d 184, 193 (1983)). A special relationship can be formed in three ways: "(1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation." *McLean,* 12 N.Y.3d at 199. Plaintiff proceeds against Mount Kisco on the first and second theories. (Pl. Opp. 21–24.)

To proceed under the first theory, or the "statutory duty" prong, "the governing statute must authorize a private right of action." *McClean*, 12 N.Y.3d at 200 (citing *Pelaez v. Seide*, 2 N.Y.3d 186, 200 (2004)). When a statute does not explicitly provide for a private right of action, one "may be fairly implied when (1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme." *Id.*

Under the second theory—the "duty voluntarily assumed" prong—Plaintiff must establish "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Valdez v. City of New York*, 18 N.Y.3d 69, 80 (citing *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987)); *McLean*, 12 N.Y.3d at 201.

Assuming, *arguendo*, that Mount Kisco's enforcement of the housing regulations is a ministerial act, Plaintiff fails to allege that a special relationship existed under either of these theories. As to the first theory, there is no indication from the parties that the housing regulations created a private right of action. Further, the Court is unconvinced by Plaintiff's attempts to imply one. There is no indication that the housing regulations were enacted for the benefit of a particular class of persons. Rather, the housing regulations subject to this suit, much like most regulatory ordinances, are aimed to serve the general public. *See e.g.*, *Metz*, 20 N.Y.3d at 179–81 (holding that the regulations requiring vessel inspections undertaken by the State for safety purposes created a duty of care owed by the State to the general public and not to specific passengers of the vessels). This finding is further buttressed by Plaintiff's description of the alleged class: "a resident of New York who was entitled to the basic level of protection in connection with the construction and

maintenance of his rental unit." (Pl. Opp. 23.) Such a broad category simply lacks the specificity to constitute a protected class under the housing regulations. *Metz*, 20 N.Y.3d at 179–81; *but see Pelaez*, 2 N.Y.3d at 201 (finding the Plaintiffs met the first prong because the Lead Poising Act specifically mentioned children and pregnant women as the statutory beneficiaries); *T.T. v. State of New York*, 151 A.D.3d 1345, 1347–48 (3d Dept. 2017) (finding that statutory and regulatory provisions enacted for the benefit of persons with developmental disabilities was a class within which Plaintiff fell). The pertinent housing regulations, as presented to this Court, simply lack the specificity required to satisfy the first prong.

Plaintiff likewise fails under the second theory. There is no indication whatsoever that Plaintiff had any direct contact with an agent of the municipality, or that there was an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of Haniel or Plaintiff as required under New York Law. *McLean*, 12 N.Y.3d at 201. Therefore, even if enforcement of the housing regulations constitutes a ministerial act, Plaintiff's state law claims against Mount Kisco must be dismissed.

### III.    Liability of Antonio Luppino

Plaintiff brings three state-law claims against Mr. Luppino sounding in conscious pain and suffering, negligent infliction of emotional distress, and wrongful death. Defendant Mr. Luppino moves to dismiss these claims because the Complaint fails "to ascribe to Mr. Luppino the requisite level of exclusive authority or responsibility to render him liable to the Plaintiff." (Mem. of Law in Supp. of Def. Antonio Luppino's Mot. to Dism. ("Def. Luppino's Motion") 6, ECF No. 53.) Plaintiff brings these claims based on Mr. Luppino's alleged nonfeasance and "affirmative negligence" in creating the dangerous conditions leading to Haniel's death and maintains that Mr. Luppino was either an agent of Mrs. Luppino, or the was responsible for managing the Property. (Pl. Opp. 3.)

Under New York Law, "a landowner owes a duty of care to maintain his or her property in a reasonably safe condition." *Gronski v. County of Monroe*, 18 N.Y.3d 374, 379 (2011). The existence of that duty "is premised on the landowner's exercise of control over the property, as the person in possession and control of property is best able to identify and prevent any harm to others" *Id.* (quotations and citation omitted); *see Nappi v. Inc. Village of Lynbrook*, 19 A.D.3d 565, 566 (2d Dept. 2005) ("[L]iability for a dangerous condition on property is generally predicated upon ownership, occupancy, control or special use of the property") (quotations and citation omitted). It is also well settled that "as a general rule, an agent is liable to third persons only for affirmative acts of negligence." *Lennon v. Oakhurst Gardens Corp.*, 229 A.D.2d 897, 898 (3d Dept. 1996); *Robles v. City of New York*, 47 Misc. 3d 1201(A) (NY. Sup. Ct. 2015). Notwithstanding, "a managing agent of a building may nevertheless be subject to liability for nonfeasance where it has complete and exclusive control of the management and operation of the building." *Lennon*, 229 A.D.2d at 898.

First, it appears that Plaintiff has not alleged any facts in the Complaint indicating that Mr. Luppino engaged in acts of "affirmative negligence." Plaintiff argues that the Complaint alleges that Mr. Luppino took affirmative steps "to erect, reconstruct, restore and/or structurally alter the Property, including the basement apartment, without a building permit and renting the apartment to Haniel despite the fact that he had actual knowledge that the basement was not equipped with the requisite emergency escapes and/or rescue openings, was not equipped with smoke detectors and was, quite simply, unfit for human occupancy." (Pl. Opp. 3.) The allegations in the paragraphs cited by Plaintiff for that proposition, however, do not support a claim of affirmative negligence. Plaintiff's allegations in the identified paragraphs consist of permissive actions such as the Defendant "failing to perform timely inspections of the property" or "permitting the Property to be erected, reconstructed, restored and/or structurally altered without a building permit." (AC ¶ 176.)

These allegations are, thus, ones for nonfeasance rather than affirmative negligence because they do not allege that Mr. Luppino took any affirmative actions but, rather, describe his failure to comply with the law. *See Monteleone v. Incorporated Village of Floral Park*, 74 N.Y.2d 917, 919 (1989) ("Village's planting of, and subsequent failure to prune, the tree that injured plaintiff did not constitute affirmative negligence"); *Davidson v. Town of Chili*, 35 A.D.3d 1246, 1247 (4th Dept. 2006) ("defendant's failure to install snow fences is nonfeasance, as opposed to affirmative negligence") (quotations and citations omitted); *DiGrazia v. Lemmon*, 28 A.D.3d 926, 928 (3d Dept. 2006) ("the supposed failure to clear [snow from the sidewalk] would constitute nonfeasance on defendant's part rather than the affirmative negligence"); *German v. Bronx United in Leveraging Dollars, Inc.*, 258 A.D.2d 251, 252 (1st Dept. 1999) ("[P]laintiffs' complaint does allege that the defendants caused or created the dangerous condition. Thus, plaintiffs allege more than mere nonfeasance, but also affirmative acts of negligence"); *L.R.O. v. Gun Hill Management, Inc.*, 24 Misc. 3d 1223(A) (N.Y. Sup. Ct. 2009) ("[P]laintiff is not alleging mere nonfeasance, but is instead alleging that defendant acted negligently and recklessly in allowing, causing, and/or neglecting hazardous lead-based paint conditions in the plaintiffs' apartment") (quotation and citation omitted).

Second, Plaintiff has not sufficiently alleged that Mr. Luppino was in exclusive control of the property. Plaintiff asserts that Mr. Luppino was responsible for managing the property including maintenance issues, regulatory compliance, rental collection, and overseeing the day-to-day operations of the Property. (AC ¶¶ 164–65.) Plaintiff further alleges that Mr. Luppino represented the property owner during one or more inspections on the property and was listed as the "Local Person in Charge" or the "Responsible Party" on documents provided to Mount Kisco. (*See id.* ¶¶ 166–68.) Indeed, Mr. Luppino's name appeared on various applications and registry forms received by Mount Kisco. (*Id.* ¶¶ 166–74.) Although Plaintiff alleges that Mr. Luppino assumed multiple responsibilities and took on varying obligations, the allegations lack the necessary component of

exclusive control. Plaintiff does not indicate, nor does the Court find, allegations supporting the proposition that Mr. Luppino was in complete and exclusive control of the property. The allegations in the Complaint merely indicate that Mr. Luppino took on various responsibilities, and do not plausibly suggest that these responsibilities displaced Mrs. Luppino's, or the Trust's, control over the property. *See Ioannidou v. Kingswood Management Corp.*, 203 A.D.2d 248, 249 (2d Dept. 1994) (noting that an agent is not in complete and exclusive control of the premises when "the owner had reserved to itself a certain amount of control").

Thus, Plaintiff's claims against Mr. Luppino fail to state a claim upon which relief can be granted. Plaintiff is, however, granted leave to replead the claims against Mr. Luppino if she can offer, in good faith, factual allegations supporting Mr. Luppino's exclusive control over the property.

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiff is granted leave to amend the municipal liability, selective enforcement, intentional discrimination, and any claims against Mr. Luppino in conformity with this opinion. The Court respectfully directs the Clerk of the Court to terminate the motions at ECF Doc. No. 50 & 55.

Plaintiff is directed to file a Second Amended Complaint in conformance with the above on or before June 1, 2018. Failure to timely file a Second Amended Complaint will result in dismissal of all federal claims, all claims against Mr. Luppino, and remand to State Court. In the event Plaintiff files a Second Amended Complaint, Defendants shall answer or seek a pre-motion conference on any potential motion to dismiss by June 22, 2018.

Dated: May 11, 2018                    SO ORDERED:
       White Plains, New York

                                       _____
                                       NELSON S. ROMÁN
                                       United States District Judge